Bank of Scotland. Good morning. Good morning. May it please the court, John Siegel for the plaintiffs. On every issue on this motion to dismiss, the district court engaged in hasty fact-finding while applying inapposite law. The court simply failed to review and understand the underlying bankruptcy proceeding, so it applied Chapter 7 cases and reached a result contrary to the purpose of Chapter 11 and contrary to the purpose and function of the plan of reorganization in this bankruptcy. In this Chapter 11 plan, the full amount of Citizens Bank's secured loan remained intact. The secured lender took not a penny of haircut in this bankruptcy, and the plan provided that the plaintiff debtors were to repay 100% of the loan. Recovery on plaintiff's LIBOR fraud claims here against RBS. Will, under the plan, go toward the deficiency owed to citizens as a secured lender? Counsel can speak to the fact that they're representing parties with different interests and that they're representing citizens here on a position that will deny citizens potentially the $67 million value of their secured claim. But under the plan, the claim that the restructured debtors are prosecuting here will go toward the deficiency that remains even after the sale of the hotel portfolio years later. What's going on here is that a non-party, a stranger to the bankruptcy, is trying to in order to evade liability or litigation. Where is this claim found in the confirmed plan of reorganization? The plan is, the claim is found under the bankruptcy law and in the plan as an asset of the restructured debtor post-confirmation. This is an asset that arose post-confirmation. You're saying it's an asset post-confirmation. Correct. The question is, how did it get to be an asset post-confirmation if the debtor had a notice of it before the proceeding closed? I mean, it's after the confirmation, I mean, you concede that you had inquiry notice after the confirmation but before the proceeding was concluded. Yes, and the district court also found that notice here arose post-confirmation. The court can decide this issue on one clear established issue of law that the district court totally missed. And that is at the time of this bankruptcy, under Fifth Circuit law, this was an Eastern District of Texas bankruptcy. Under Fifth Circuit law, it's well established that there's no duty to update bankruptcy disclosures for claims that arise post-confirmation. Courts in the Fifth Circuit have said that over and over again from 2006 in Woodard versus Taco Bueno restaurants, three or four times by the time this bankruptcy was discharged. In what district was the bankruptcy proceeding conducted? Texas, the Eastern District of Texas. And under Fifth Circuit law at that time, a post-confirmation duty to disclose was uncertain at best according to the Woodard decision. Even the most versed in bankruptcy law are unclear on this issue. It was an undecided issue that skilled, experienced bankruptcy counsel here in Texas understood under the Fifth Circuit law at the time that updated disclosures were not required. Now the issue of when knowledge of the claim arose is most certainly a fact issue that as on every other fact issue in this case, the district court jumped the gun on. But we don't have to get to that and we don't have to get to any other issue in the case because under the prevailing Fifth Circuit law, there was no requirement to update the disclosures. Therefore under the plan, both Section 11.5 of the plan as well as well-established bankruptcy law under Chapter 11 that governs here, not the Chapter 7 precedents that the district court applied, all claims are for the restructured debtor. Now- Can I ask a question? Scattered through the papers are about four or five different possible dates for notice. Some as early as 2008, and I am sympathetic to your concern that the record hasn't really been established factually on that. But if the notice was pre-confirmation, then would you agree that the defendants win? The notice is not pre-confirmation, Judge. But just play with me. If it was, if the facts turned out that way, that the notice was pre-confirmation, and I saw 2008 as a possible date, then would the defendants win on this claim? So if the case is remanded and the court actually does fact-finding here, and if it makes a finding of fact on a full record that notice was pre-confirmation, then I would agree the law might be different. However, that's clearly a fact issue, and even this judge, even this district court, which has now twice entered seriatim decisions on specific issues that it chose to decide on on a vast motion that it reached its own analysis, not submitted by any of the parties, even this district court, did not find and was not willing to rule that this was a pre-confirmation notice case. Since the district court here ruled that there was a duty to disclose until the bankruptcy case is closed, not just at confirmation, it didn't reach the issue of what the debtor knew and when they knew it. Isn't that correct? That is correct. The district court completely missed the issue of whether updated disclosures was required under the governing law of the circuit where this bankruptcy was determined. ...conclusion that updated disclosures were required up until the time the case closed, not just at confirmation. That was an erroneous legal conclusion, but the issue for this court is what's the right remedy in this situation, given that the Fifth Circuit law is entirely clear that there was no duty to update disclosure. Given that this claim was reserved in section 11.5 of the bankruptcy plan, given that under operation of chapter 11 this is a claim that belongs to the restructured debtor, given that the defendants had knowledge of their own LIBOR fraud and what they're saying to this court is that we should be denied our day in court because this global bank did not, the subsidiary of this global bank, that we did not disclose back to Citizens Bank that its own parent had made certain disclosures in its own SEC filings. That's what's the issue here. This is a corporate family. We are an outsider to that corporate family and their only claim is we should be denied our day in court for their defrauding us because we didn't read a footnote in their SEC disclosure. In the Coastal case, the Fifth Circuit said that if the debtor has enough information prior to confirmation to suggest that it may have a possible cause of action, then that is a known cause of action such that it must be disclosed. Now, prior to confirmation was like a dozen lawsuits had already started over this LIBOR thing, and there were other indicia of these investigations, and therefore, I'm not sure I can square that with your argument. Nobody is more familiar with those LIBOR cases than Your Honor. That's an antitrust MDL. Yeah, but we deal with this long after the fact. I mean, the percolation is not something that we've really dealt with. What the record shows, and it's a fact issue, what the record shows is RBS had disclosed that it was cooperating with a subpoena. It is not the law that a debtor has to survey every public source of information and disclose in its bankruptcy filings that it might have a claim against any creditor who's been publicly reported that they responded to a government subpoena. I'm just reading what the fifth circuit says. Nor is it the law that we have to look at the docket and say, oh, there's an antitrust class action out there that involves the same apparent of the same bank who were a borrower, therefore, we have to disclose that in the future we might have a claim against them. The articles in 2008, they do not even mention RBS. So it's not a rule of bankruptcy general applicability that you have to scour the world and throw in every strike suit, every mention in a news article, every piece of dirt you can find against your creditor. Were they responding to the subpoena before confirmation of this Chapter 11 bankruptcy? They disclosed in an SEC filing that they were cooperating with a government investigation about LIBOR. What that means, whether we knew it, whether we should have disclosed it, is a fact issue that even the district court here did not rule that that was pre-confirmation notice. The district court . . . The clients knew that they were induced to enter into this original deal with LIBOR, and they were not so sure they wanted to do that. They knew LIBOR was the linchpin of this interest swap. Why wouldn't they be interested if someone was investigating LIBOR? At the time of confirmation, these plaintiffs were prosecuting an adversary proceeding against Citizens Bank on the theory that there was a mutual misunderstanding and lender liability over the LIBOR fraud. They believed it was because the world economy had gone south, not because RBS had committed a fraud. And that adversary proceeding, of course, was dealt with in the plan. That is the best evidence that at the time of confirmation, they didn't know that they might have a LIBOR fraud claim. But at any rate, that is a fact issue. Assuming that there is a LIBOR fraud that affected the LIBOR rate during this particular time, I'm not sure how that could possibly affect your client, because the swap transaction basically makes the LIBOR rate . . . it just washes it out. And you ended up paying a flat rate of interest, just like everybody else. Why these transactions took place this way, I don't know, but they probably were laying off this book of business or that book of business. But as far as your client is concerned, LIBOR was built in, then there was a swap, and LIBOR was pulled out. So that's the question that Judge Sack asked me last time we were here. And the answer is . . . And what was the answer? We were injured because a dishonest bank sold us a net fixed rate when what we wanted was a floating rate, and the floating rate would have been lower. Gallopi versus Deutsche Bank Trust in the Ninth Circuit. The floating rate would have been lower? Floating rate turned out to be lower, yes. You negotiated a fixed rate, and you agreed that that fixed rate was not affected by LIBOR? We were dealing with a bank that insisted, that demanded that we take a swap, which we didn't want, that promised that it was based on a fair and honest interest rate. No, it wasn't, because if the LIBOR was crooked, it went in crooked, and then it was taken out crooked. You were paying a flat rate. Your Honor, a borrower has a right to deal with an honest bank when it is defrauded by a dishonest bank, is injured, and it can sue for fraud, which is exactly what Judge Buchwald held the first time in the MDL. If you're dishonest, you have a cause of action. What are your damages? If you're ending up paying a fixed rate that's not affected by LIBOR, assume LIBOR is, you know, it's crooked, it's washed out. First of all, this Court has heard this issue once. The District Court has heard it twice and has not ruled because it is a fact issue. Now, the, is the form of swap agreement that RBS uses and every other bank in the LIBOR panel or that the issues derivatives uses has a representation that it is an honest and accurate rate of interest. The allegation is, and the plea bargains that they've entered establish that it was not. We're injured because we go to do business with someone who has their thumb on the scale and sells us an instrument that they are manipulating the rate to their advantage and our disadvantage. How is it to your disadvantage? That's what I want to know. How is it to your disadvantage? Because the difference between what we paid and what we would have paid but for the swap and the fraud was the difference between solvency and insolvency. And that's why this experienced, highly successful developer for the first time in his life ended up in bankruptcy. Let me ask the same question that Judge Jacobs asked because I'm not satisfied with the answer. If LIBOR was on both sides of the trade, what difference does it make if it's high or low? What the difference? Or manipulated? Because if we knew we were dealing with a bank that was manipulating the rate, we wouldn't have done business with that bank. We didn't want this instrument. They demanded it as a condition of the deal based on their representations that it was honest and accurate and that the interest rates were going to be going up. That was a straight out garden variety fraud, which is a claim that even Judge Buchwald, who dismissed the antitrust MDL, said that's the claim that these borrowers should be bringing. And that's the standing harm that the Ninth Circuit found of Globe versus Deutsche Bank Trust. That someone who does bank business with one of the LIBOR panel banks that was engaged in fraud, is per se injured because they've done business with a bank that's being dishonest to them about the interest rate. What's the measure of damages? A measure of damages is the difference between what we paid under the swap and what we would have paid under a floating interest rate without a swap. It's the difference between solvency and insolvency. It's the difference between this hotel portfolio pre-bankruptcy and post-bankruptcy. And the recovery of this claim goes to the secured lender in the first instance. Thank you. Thank you. May it please the court, I'm David Lesser for the appellees. I'd like to pick up where Mr. Siegel left off. I was intending to speak mostly about bankruptcy, but I do have a lot to say about this issue. LIBOR is a complete red herring in this case. I want to quote Mr. Siegel before the district court, quote, the monthly payment netted out at a fixed rate. That is at JA 758. LIBOR had absolutely no impact on this transaction. BPP's theory in this case is we said we'll sell you a silver tie with blue spots and he says now I really wanted a red tie. He doesn't have any injury. In the Gallopi case, the issue there on appeal in the Ninth Circuit was whether the plaintiff had Article III standing based on the allegations, which were roughly similar to the allegations here in the Ninth Circuit, said that was sufficient for Article III standing. You alleged that you had a transaction you didn't want. On remand, the district court analyzed the loan. It was a loan that had a fixed rate term that would switch to a floating rate. The district court determined that the loan had never switched to the floating rate, so the plaintiff had never actually paid any LIBOR-based payments and dismissed the case. It was a summary judgment because you had to analyze the loan, actual payments. Judge Buchwald dismissed a case just like this one called Highlander. It was similarly a plaintiff who had a loan link swap transaction at a predetermined fixed rate. Judge Buchwald dismissed that case because the plaintiff had no injury. Mr. Siegel has not articulated any theory of injury in this case. There is none in the complaint. The argument that it was a fraud and they were per se damaged, even if they can't prove a specific dollar loss, that they're injured by dealing with a fraudulent bank. That's not sufficient to plead an injury. Each of the causes of actions requires an injury. They're just saying, I wish you had told me something different. If the bank told the borrower, we will lend to you at a fixed rate. We will lend to you at 4.8125%. It's a commercial arm's length transaction. BPP knew that was the fixed rate it was getting. After years of litigating this case, I'm just baffled as to what the theory of injury in this case is. Couldn't it look something like this, that two parties, one the bank from the perspective of the complaint, which is where we have to be now. The bank knows that LIBOR is artificially suppressed. The customer doesn't know. And during the negotiations, the bank says a lie. They say, we're really worried that LIBOR is going to go up and you won't be able to afford it. So you have to do a fixed rate or nothing. But they know that they are in cahoots with the other London lenders and artificially holding it down in the course of the negotiation. Doesn't that look like a fraud? No, your honor. And to be clear, the allegation in the complaint is that, there are two. One is that the banks misrepresented that LIBOR was an accurate and reliable rate, which is irrelevant to somebody who's entering into a fixed rate transaction. It also wouldn't dissuade someone from entering into a floating rate transaction, for any reason I can discern. The other is that- I mean, with a different bank, if they wanted a floating rate. Well, they don't allege that there was any floating rate transaction offered to them by any other bank. What they allege, and Mr. Siegel has said that in his papers and in court. But what they allege is that they wanted a floating rate without a swap from Citizens Bank. But returning to your question, the other allegation is that BPP will not be able to meet its obligations under a floating rate, and we will not lend to you at a floating rate. Right, because LIBOR might go through the ceiling, might go up. That's a reasonable inference. It's not alleged in the complaint that that's what they were told. Counsel, I have two short questions. Do you concede that we should look to the Fifth Circuit law for the appropriate level of knowledge a debtor has to have about a claim in order to be required to schedule it? No, and I do want to return to your question. No, this case was filed in the Second Circuit, and the governing law is the law of this circuit. The issue about whether the law was in flux in the Fifth Circuit has been used by some of the courts in court, including the Woodard case that Mr. Siegel cites, to determine whether, as a matter of equity, the court ought to apply judicial estoppel. Because if the law is in flux, for example, these are Chapter 7 or Chapter 13 cases with individual debtors. You might say, if the debtor, if the law wasn't clear that I'm not going to estop under that circumstance. The Woodard case actually says that the debtor was obligated to disclose, but the court declined to estop as an equitable matter. Also, just to be clear, those cases concern situations where the debtor was not on notice of. Where the claim didn't arise until post-confirmation. In other words, in Woodard, concerned a debtor who had a claim against an employer didn't even start working for that employer until after confirmation. So it's a very different set of circumstances. If I could just finish my response to your question. Saying that you will not be able to meet your obligations, is a classic forward-looking statement that's inactionable in these circumstances. The ISDA agreement expressly disclaims any reliance or fiduciary duty. And even if it didn't, this is a classic arms-length commercial transaction. Lastly, even if it were interpreted as a prediction about what's going to happen to interest rates, the allegations in this case are that the banks suppressed LIBOR by a couple of basis points. Not that they knew whether LIBOR was going to go up or down. This is at a January 2008 meeting. LIBOR rates, historical LIBOR rates are publicly available. LIBOR did go up in October of 2008. LIBOR was much higher than it was in January 2008, and it fell off a cliff. We're in the midst of a financial crisis. Counsel, my other question is, what about the conflict of interest that Mr. Segal mentioned? Since if they prevail on this claim, Citizens Bank would get some money, and you are here to try to stop them from pursuing this claim. And you represent Citizens Bank, do you not? I do. Citizens Bank is a co-defendant in this case. I understand, but they don't have separate counsel. All I can say is Citizens Bank is perfectly able to protect its interests. Citizens Bank is able to pursue a claim if it would like. I don't know. The argument that Mr. Segal made was that if they prevail in this claim, they would reimburse Citizens Bank for the unpaid portion of the loan. So they would, they stand to gain. Judge Furman, when he dismissed the claim, stayed his order for six months so that any creditor or other interested party could go in and seek to reopen the bankruptcy to assert the claim. Nobody did it, including Citizens Bank. Surely, in bankruptcy, if there's an asset that nobody wants, it remains post-bankruptcy with the debtor. And why are we not looking at a situation now, whatever the merits of this underlying claim, and I'm not sure I either understand it or appreciate it, but whatever it is, nobody wants it. And therefore, what was the effect of failing to schedule it? If they'd scheduled it, nobody would want it anyway. They would end up with it. So here we are. If they had scheduled it, and I would like to march through what they actually knew and when, because I think it's key. But if they had scheduled it, Citizens Bank would have had the opportunity to vote against the plan, because had it known that the debtor was reserving a claim against its affiliates, that would have changed the situation. And you received- But the plan contemplates Citizens Bank being fully reimbursed for the amount of the loan. Why would they have objected to such a claim? Citizens Bank was not fully reimbursed. The plan enabled the debtor to sell off hotels under a schedule. It defaulted under the plan. Citizens also gave up rights of its own. Being fully reimbursed, they're litigating with the guarantor to try to collect the shortfall. Was there an exchange of releases in the bankruptcy? There was an exchange of releases. Then BPP Illinois released Royal Bank of Scotland and Citizens? It released Citizens Bank, which is why it is not naming Citizens Bank with respect to these claims. It didn't release the affiliates. So basically, it had sued Citizens Bank in an adversary action. It then released its claims against Citizens Bank a month after the bankruptcy closed. It didn't disclose any claims related to LIBOR, related to the loan link swap, related to any affiliates. It didn't cure the failure post-confirmation to fail to disclose. Then a month after the bankruptcy closed, it sued the affiliates. The disclosure obligation is clear in the bankruptcy law. There's a dispute about whether it continues post-confirmation. You could have asked for a release, Royal Bank of Scotland as well. I mean, that could be ordinary prudence. But the disclosure obligation and the release work hand in glove, so you seek a release for disclosed claims. You don't need to seek a release for claims that aren't disclosed. And courts have held that the general reservation of rights that Mr. Segal points to regularly is ineffectual, a release that purports to reserve all claims, reserves nothing. If I could just go through what they knew pre-confirmation. They knew that they had a loan link swap. They knew that it was allegedly negotiated with RBS and RBS citizens in January 2008. They knew that it was allegedly tied to LIBOR in some way. They knew actually that RBS was on the LIBOR panel. That's at JA 774, Mr. Segal says, that RBS represented at that meeting that were on the LIBOR panel. They knew enough to actually- Do you have any idea that LIBOR was being manipulated? Is there anything public about that? They admit in their prior brief to this court at page 23 that they had notice of the fraud as of May 2011. And as a judge- I'm not sure I recall seeing anything like that. I mean, I think that they admit they were on inquiry notice in July of 2012, but that's after confirmation. No, in their brief at page 23 in the prior- Which brief are we talking about? Because this is a very long tort litigation here. It's their opening brief in the prior appeal in this court. And what they said is, we did not have notice of fraud until May 2011. Now, if I say to you, I did not have notice that this would be the esteemed panel that would be hearing this case today until the court released the panel on Thursday, I'm telling you that on Thursday, I knew that this would be the panel to hear this case. Let me ask you something that I simply don't understand about the bankruptcy principles involved here. Between confirmation and substantial consummation could be a considerable period of time. What happens if a major asset is discovered in that period of time? And very often if you have corrupt officers, that could easily happen. Well, under Bankruptcy Rule 1009, the debtor can seek to amend the disclosures. Under the plan here- Yes, but the debtor doesn't want to do it and would like to keep that asset post- They lose it. It remains with the estate. Under Section 554, it hasn't been scheduled, it hasn't been administered. So it evaporates. It is a confusing concept in bankruptcy, but- It evaporates. It remains with the estate. What if it's an asset? An asset, if it's a building? The building doesn't evaporate. Somebody has to own it. What happens? I don't, I'm reassured that you don't know because I don't know. And I know that's not exactly the facts of this case. But if there were an answer to that, I think we would have some better understanding of how equity bankruptcy principles might work in this case. I understand the confusion and if you speak with bankruptcy lawyers, they will share your confusion. If I speak with bankruptcy lawyers, I'll get more confused. That's what always happens. But what is clear is that it doesn't revert to the debtor who failed to disclose it. And it's crystal clear that in this instance where they knew about it pre-confirmation, that it doesn't revert. Just one more point about the- You want to do a chronology of knowledge. Well, I started the chronology of knowledge. I want to note that you are familiar with the proceedings in the MDL. But the very first complaint in the MDL, docket number one, is a complaint that includes RBS as a defendant. It includes a CEA claim, which has a fraud element to it. There were 21 cases filed. What was the date of the first complaint? It's April 2011. I don't remember the exact date. April 15th, I think? April 15th, 2011. And by August, 20 other cases had been filed. They include unjust enrichment claims. There are fraud claims in the case. There are all species of claims. The crucial point here is that, as Judge Jacobs said, under the bankruptcy disclosure standard, they didn't have to know that they had a particular type of fraud claim for LIBOR manipulation. They had to know that they had a possible claim, speculative, non-possessory, derivative, future. I'm just quoting from Coastal Plains now. They did not need to know all the facts or even the legal basis for a cause of action. That's a Fifth Circuit case. That's a Fifth Circuit case. But you say it doesn't govern. I believe. Well, I say that the Fifth Circuit law about whether there was a post-confirmation duty doesn't govern. I'm pointing to the Fifth Circuit case as persuasive authority, but the Second Circuit law on this is the same in the charge law case and many others. The standard is that you have to disclose any possible claim, however speculative. These are very creative lawyers. They have been litigating this case for years on a LIBOR manipulation theory when they have a fixed rate loan. So surely they could have speculated that they had some claim based on the swap against the people they say induced them into entering into the swap, whether that theory is unjust enrichment or negligent misrepresentation or fraud. And had disclosed some claim. They disclosed nothing. Thank you. Thank you. Mr. Siegel has been patiently waiting for rebuttal. Thank you, Your Honor. These are interesting discussions of fact issues without a developed record on a motion to dismiss. Let me start with your question of what happens with a post-confirmation asset. Counsel was mistaken. Section 554 does not apply in a chapter 11. What happens is under 11.5 of this plan and under 11.41 of the code, that asset is an asset of the restructured debtor. The creditor can move to reopen the bankruptcy. The standard is what's in the best interest of the estate. Who was the estate here? But the creditor can't move to reopen without knowing that this contingent claim exists. I'm answering the question of what would happen if it were disclosed. The best interest of the estate here is three parties. It's Citizens Bank, which under the plan gets 100% repayment of their loan. They would have no interest in reopening the bankruptcy, and indeed didn't when Judge Furman- They would get 100% before hotels were sold at certain prices. I mean, they aren't holding for $64 million now, are they? And collection on this claim, that's right. The hotels, their franchise agreement- They're whole based on the collection of the claim that we're talking about here. Yes. The hotels, their franchise agreements were assumed by the reorganized debtor. Reorganized debtor wouldn't move to reopen the bankruptcy because it's prosecuting this claim. The best interests of the estate are preserved here. Now, on the injury question, they lied to us. They said we were getting an honest rate that was going up at a time when they knew they were actively pushing it down. We were injured by that financially and in terms of the honesty and integrity of the bank we were dealing with. We allege at paragraphs 93 and 94 of the complaint that there were alternative structures available, that we wanted a floating rate loan, that we had done that in the past from Wells Fargo and others, and that that option was available, but we were defrauded into this structure. Fifth Circuit law has to apply. How could a Texas bankruptcy lawyer in 2011 and 2012 know that his decision of whether to amend schedules in a chapter 11 is going to be determined four or five years in the future under Second Circuit law? A reservation of rights cannot explicitly and specifically reserve an unknown claim at the time of confirmation. That's why there's all this case law that says a reservation of rights of future discovered claims belongs to the restructured debtor. That's what happened here. Three and a half years litigating a long and tortured motion to dismiss, two premature wrongful dismissals on fact issues. It's time for this case to proceed. It's enough erroneous one-off dismissals and hasty fact finding. These plaintiffs deserve a chance to prosecute their LIBOR claim. Let the guarantors who were involved in this transaction through the same executives wearing multiple hats move to amend. And at long last, let's get this case going. It's an interesting discussion, but four years later, we're on a motion to dismiss, debating fact issues. Thank you. Thank you both. We'll reserve decision. The case of Tannerite Sports versus NBC Universal is taken on submission. The case of United States versus Green is taken on submission. The case of United States versus Sawyer is taken on submission. And the case of Jwala versus Time Warner Cable is taken on submission. That's the last case on calendar. Please adjourn to court. Court is adjourned.